## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

WENDY TUTTLE,

    *Plaintiff*,

v.

METROPOLITAN LIFE INSURANCE COMPANY,

    *Defendant*.

_____/

CASE NO. 20-CV-13013

DISTRICT JUDGE PAUL D. BORMAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO AFFIRM THE ADMINISTRATIVE RECORD (ECF Nos. 31) AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (ECF No. 32.)

**I.   RECOMMENDATION**

Plaintiff Wendy Tuttle brings this action for wrongful denial of life insurance benefits after the death of Plaintiff's husband, William J. Tuttle, against Defendant Metropolitan Life Insurance Company under the civil enforcement provision of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Both sides have moved for judgment on the administrative record. (ECF Nos. 31, 32.) The parties have fully briefed their motions and the case is now ready for Report and Recommendation, pursuant to E.D. Mich. L.R. 7.1(f)(1). I recommend **DENYING** Defendant's motion to affirm the administrative decision (ECF No. 31) and **DENYING** Plaintiff's motion for summary judgment. (ECF No. 32.)

1

## II. REPORT

### A. ERISA

Concerned about the "growth in size, scope, and numbers of employee benefit plans," Congress passed ERISA in 1974 to ensure uniformity and stability in this rapidly changing field and to protect the interests of participants and beneficiaries of these plans. 29 U.S.C. § 1001; *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208 (2004). Among other things, ERISA regulates employee welfare benefit plans operated through insurance which provides payments in the event of disability. 29 U.S.C. § 1002(1); *Am. Council of Life Insurers v. Ross*, 558 F.3d 600, 604 (6th Cir. 2009). Participants are employees or former employees who are or may become eligible to receive benefits under the plan. 29 U.S.C. § 1002(7). Beneficiaries, in turn, are persons "designated by a participant, or by the terms of an employee benefit plan, who [are] or may become entitled to a benefit thereunder." *Id.* § 1002(8).

At issue here is ERISA's civil enforcement provision allowing a plan beneficiary to bring an action to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.* § 1132(a)(1)(B). This "straightforward" provision lets beneficiaries bring suit for any benefits he believes have been wrongly withheld. *Davila*, 542 U.S. at 210. ERISA does not, however, establish whether a beneficiary is entitled to disability benefits—eligibility is determined by the plan. *Cleveland v. Liberty Life Assur. Co. of Boston*, No. 06-137080, 2009 WL 649893, at *2 (E.D. Mich. Mar. 10, 2009) (adopting Report & Recommendation). Nonetheless, claims for benefits must receive a "full and fair

2

review" and participants are entitled to "specific reasons" for denial. 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003); *Curry v. Eaton Corp.*, 400 F. App'x 51, 59 (6th Cir. 2010).

### B. Factual Background

This action was removed to this federal court on November 10, 2020. (ECF No. 1.) Plaintiff field an objection to the removal which this Court denied on December 3, 2020. (ECF Nos. 2, 7.) Plaintiff filed the instant statement of procedural challenge on February 4, 2021, Defendant responded (ECF No. 14) and the matter was referred to the undersigned magistrate judge on February 19, 2021. (ECF No. 15.)

The instant complaint alleges a wrongful denial of life insurance benefits after the death of Plaintiff's husband, William J. Tuttle. Plaintiff was married to William Tuttle at the time of his death and is the named beneficiary of the life insurance policy that was issued by Defendant as part of an ERISA plan. (ECF No. 1, PageID.17.) The life insurance premiums for the policy were paid via a direct payroll reduction from William Tuttle's paycheck from General Motors. (*Id*.) The policy provided that if the insured was "'not paying under the Payroll Deduction Plan and if the Cash Surrender Value on any Monthly Anniversary is less than the Monthly Deduction for that month, there will be a Grace Period of 62 days after that anniversary to pay an amount that will cover the Monthly Deduction. We will send You and any assignee on Our records at last known addresses a notice of the Grace Period.'" (*Id*.) William Tuttle separated from General Motors on August 1, 2018, after becoming ill. Under the separation agreement, General Motors gave William Tuttle

3

severance pay which would end on December 31, 2018. (*Id*.) William Tuttle passed away on December 10, 2019.

After his employer severance pay ended, Mr. Tuttle was sent a letter on January 4, 2019, informing him about a change in his policy—ostensibly regarding his change from employer paid benefits to direct bill after his severance pay ended. The last payment made to Mr. Tuttle's policy was on February 7, 2019. (ECF No. 31, PageID.1148.) On February 26, 2019, Defendant sent a letter notifying Mr. Tuttle that he had a 62-day grace period to make payments before his policy lapsed; on March 18, 2019, Defendant sent another letter informing Mr. Tuttle that his grace period was about to expire; and on April 22, 2019, Defendant sent a letter informing Mr. Tuttle that his policy had lapsed as of April 19, 2019. (*Id*. at PageID.1149.)

Eleven months later, on December 24, 2019, after Mr. Tuttle had passed away, Plaintiff contacted Defendant to inform Defendant of her husband's death and she was "told the life insurance policy lapsed." (ECF No. 1, PageID.18.)

Plaintiff avers that from the time William Tuttle separated, from the time his severance ended, or from the time of his death, "[a]t no time did William J. Tuttle, deceased, or Plaintiff, WENDY TUTTLE, receive notice of premium payments due or notifications of lapse of the life insurance policy issued by Defendant[.]" (*Id*. at PageID.17.) Plaintiff further avers that had such notices been received, the premiums would have been paid. (*Id*.) Plaintiff requested "all invoices of past due premiums, but none were provided." (*Id*.)

However, on April 6, 2020—several months after Mr. Tuttle's passing—Plaintiff received a letter addressed to William Tuttle from Defendant informing William Tuttle that his "life insurance premiums would no longer be paid automatically through the current group billed process, and he had 'the option to continue [his] life insurance coverage on an individual basis by paying premiums directly to MetLife…' and information would later be supplied." (*Id.*)

Then, an April 14, 2020 letter from Defendant to William Tuttle provided a grace period notification and indicated that "the cash value of the certificate referenced above is insufficient to cover the cost of insurance now due. This means you are at risk of losing your life insurance coverage." (*Id.*) Since the notice informed William Tuttle of steps needed to be taken to preserve the life insurance policy, Plaintiff contacted Defendant on April 27, 2020 to initiate a claim for the death benefit; Defendant mailed forms to Plaintiff who then completed and returned the forms to Defendant along with a check for $2,964.75, which was the minimum payment described in the letter from Defendant. (ECF No. 1, PageID.19.)

On May 26, 2020, Defendant notified Plaintiff that it had denied Plaintiff's claim. (*Id.*)

On June 22, 2020, Defendant sent another letter to Plaintiff entitled "'Coverage Continuation and Conversion Options.'" (*Id.*) This letter explained that Defendant "'recently processed a death claim for William Tuttle, who was the 'Insured' under the group life insurance certificate referenced above…the Insured's certificate included a rider to provide dependent coverage of $150,000.00 for Wendy Tuttle. The certificate terminated

5

when the death claim was paid, so rider overage is no longer in force.'" (ECF No. 1, PageID.20.) On June 23, 2020, Defendant sent William Tuttle a letter returning the $2,964.75 check "because 'This policy is no longer active due to a Death Claim.'" (*Id*.)

Plaintiff mailed a denial of death benefit appeal to Defendant on July 7, 2020, and on August 13, 2020, Defendant denied Plaintiff's appeal, causing the instant action to be filed. (*Id*.) The death benefit amount in controversy is $690,779.07. (*Id*.)

### 1.     The Plan

The plan sets out the following process for determining eligibility with respect to coverage for death benefits:

> If You die before the earlier of the Final Date of Certificate and the date You elect Paid-up Benefits, We will pay:
>     The Death Benefit in effect on Your life at the time of death;
>         MINUS
>     Any loan and loan interest;
>         MINUS
>     Any due and unpaid Monthly Deductions accruing during a Grace Period;
> to the Beneficiary after We receive Proof of Your death and a proper Written claim.

(ECF No. 13, PageID.818)

The Certificate also requires that premium payments be made monthly, providing:

> Premium contributions for this Certificate will be payable each month under the Payroll Deduction Plan. Under this plan, premium contributions will be sent to Us monthly by the Employer. These payments will be made with deductions from Your salary. . . .
>
> This Payroll Deduction Plan procedure will end for You if:
>
> (a) Your employment ends; or
> (b) The Employer sends Us a Written request to end this procedure for You.

6

> If this procedure ends for You while Your insurance is in force, further premium contributions will be payable directly to Us based on Your new classification and according to the mode of premium payments that has been selected. See section titled TERMINATION/PORTABILITY.

(ECF No. 13, PageID.826).

In addition, the Plan provides a portability option with the following language:

> You are eligible to continue Your insurance if:
>
> a. Your employment with the Employer ends; or
> b. You retire, or
> c. You have not elected Paid-Up Benefits.
>
> In such event, We will automatically continue Your insurance on the terms and conditions described in this Certificate, unless We are notified by You to the contrary. When We continue Your Insurance under the Portability Option the following will occur:
>
> 1. You will have to pay Us directly Your Insurance either on a quarterly, semi-annual, or annual basis.
> 2. We will bill You directly according to the payment frequency You choose.
> 3. We will reduce Your Cash Value, if any, by Your Monthly Deduction.
> 4. Your payments may be changed as a result of a change in premium rates.
> 5. The Administrative Charge may increase.
>
> Your insurance under the Portability Option will end the earliest of the dates specified in items a-e above under When Your Death Benefit Ends. In addition, Your insurance under the Portability Option will end on the earliest of the dates specified in items h & i above under When Your Death Benefit Ends unless Your employment ended for reasons other than retirement.

(ECF No. 13, PageID.830).

Finally, the plan provides a grace period for accounts "for which premium is unpaid and the cash surrender value is less than the premium amount, and if the funds sufficient to cover the premiums are not received by the end of that grace period, the coverage will

7

end." (ECF No. 31, PageID.1145, citing METLIFE AR 000689.) The grace period language provides:

> If You are paying under the Payroll Deduction Plan and if the sum of the Cash Surrender Value on any Monthly Anniversary plus the Planned Premiums deducted from Your salary for that month is less than the Monthly Deduction for that month, there will be a Grace Period of 62 days after that anniversary to pay an amount that will cover the Monthly Deduction. We will send You and any assignee on Our records at last known addresses a notice of the Grace Period.
>
> If You are not paying under the Payroll Deduction Plan and if the Cash Surrender Value on any Monthly Anniversary is less than the Monthly Deduction for that month, there will be a Grace Period of 62 days after that anniversary to pay an amount that will cover the Monthly Deduction. We will send You and any assignee on Our records at last known addresses a notice of the Grace Period.
>
> If We do not receive a sufficient amount by the end of the Grace Period, Your Certificate will then end without value.
>
> If You die during the Grace Period, We will pay the Death Benefit minus any loan and loan interest and minus any overdue Monthly Deduction.

(METLIFE AR 000689; ECF No. 13, PageID.826)

### 2. Mr. Tuttle's Coverage Timeline

The following timeline is pertinent to the dates regarding when Plaintiff's husband was employed and when he passed away. Mr. Tuttle's life insurance premiums were paid as a direct payroll deduction from his paychecks from GM. (ECF No. 1, PageID.17.) Mr. Tuttle stopped working for GM on August 1, 2018. (ECF No. 31, PageID.1147, citing ECF No. 13, PageID.697, and ECF No. 1-2, PageID.17.) When Mr. Tuttle stopped working for GM, he no longer received "a paycheck from which to draw his premiums," and thus his "account was moved to direct bill, meaning [Mr. Tuttle] needed to pay the premiums to

MetLife directly to continue his insurance coverage." (ECF No. 31, PageID.1148, citing ECF No. 13, PageID.826.)

Defendant notes that Mr. Tuttle "was sent" a letter about how to continue his coverage after leaving GM on or around January 4, 2019. (ECF No. 31, PageID.1148.) Defendant relies on a dataset of internal information, which they have provided, to support their contention that the letter was sent to Mr. Tuttle on that date. (*Id.* citing ECF No. 13, PageID.178; Exhibit 1, at METLIFE 9.22.2021 PRODUCTION 000008 (dataset showing letter sent on this date); and Exhibit 1, at METLIFE 9.22.2021 PRODUCTION 000009 (manual duplication)).

The Administrative Record shows that Mr. Tuttle's last payment applied to his coverage was on February 7, 2019—he did not make any direct premium payments. (*Id.* citing ECF No. 13, PageID.140, 149, 338, 726.)

Defendant notes that the letters it sends out are not scanned and stored. Rather, evidence, or confirmation, of the letters "and their content" exist as a "dataset" in Defendant's electronic data management system (EDM). (ECF No. 31, PageID.1149.)

These records, from Defendant's EDM, show that on March 18, 2019, a "lapse reminder" was sent to Mr. Tuttle, "reminding [him] that the 62-day grace period was about to expire" and that he needed to take action to keep his life insurance policy active. (*Id.* citing Exhibit 1, at METLIFE 9.22.2021 PRODUCTION 000004 (manual duplication)). These records also show that on April 22, 2019, a final "lapse" letter was sent to Mr. Tuttle

9

notifying him that his grace period ended as of April 19, 2019, and his coverage was terminated, and provided information that he may be eligible for reinstatement and provided contact information for that option. (*Id*. citing ECF No. 13, PageID.150, 242, 243, 319, 335, 789, and Exhibit 1, at METLIFE 9.22.2021 PRODUCTION 000001 (manual duplication). As a result, Mr. Tuttle's coverage ceased to exist on April 19, 2019. (ECF No. 31, PageID.1150.)

Mr. Tuttle passed away on December 10, 2019. (ECF No. 1, PageID.17.) Plaintiff contacted MetLife regarding her husband's passing on December 24, 2019, and "was told the life insurance policy lapsed." (ECF No. 1, PageID.18.)

### 3. Coverage Mistakenly Reissued

Then, in March 2020, almost a year after Defendant argues that Plaintiff's coverage lapsed, "[Mr. Tuttle's] lapsed coverage was erroneously reclassified in MetLife's computer system and moved back into group billing." (ECF No. 31, PageID.1150, citing ECF No. 13, PageID.141-42, 145.) Due to this apparent electronic error, "[a]n incorrect auto-generated direct bill letter was then sent to the Decedent (who by then was deceased for over four months) on April 6, 2020." (ECF No. 31, PageID.1151, citing ECF No. 13, PageID.141-42, 145, 178.) This classification apparently triggered an automatic response in the system to issue a corresponding "lapse billing letter" that was "based on the 'new' 62-day grace period triggered by the erroneous status change." (ECF No. 31, PageID.1151.) The "new" lapse date, based on the second generated 62-day grace period, was June 4, 2020. (*Id*.) This second lapse notice was sent to Plaintiff on June 4, 2020. (*Id*.)

10

Defendant notes that just as the original letters were not kept in exact form upon being sent, this second, mistaken letter was also not kept in a physical form—only as a dataset in the EDM. (ECF No. 31, PageID.1151.)

### 4. Plaintiff's Claim Denial

On May 26, 2020, Defendant sent a letter to Plaintiff informing her that her second application for benefits, based on the erroneous, second letter, was denied—the letter explained that her claim must be denied based on the original date of lapse, April 19, 2019, and the date of Mr. Tuttle's passing, December 8, 2019, and the 62-day grace period that followed. (ECF No. 31, PageID.1153.)

On June 6, 2020, Plaintiff's attorney requested the claim file, and he received it shortly thereafter. (*Id.*)

Then, MetLife's system apparently made another mistake—on June 22, 2020, it sent a second Coverage Continuation and Conversion Options letter to Plaintiff. (*Id.*) On June 23, 2020, Defendant received a cashier's check from Plaintiff in the amount of $2,963.75—the amount of unpaid premiums. (*Id.*) The check was mailed back to Plaintiff the following day with a letter notifying her that "the payment could not be accepted because the coverage was not active." (*Id.* citing ECF No.13, PageID.157-59, 906.)

On July 7, 2020, Plaintiff appealed the determination by Defendant and requested reversal of the denial of life insurance benefits. On August 13, 2020, Defendant sent Plaintiff's attorney a letter upholding the denial of benefits on the basis that "there was no coverage in effect at the time of death[.]" (ECF No. 31, PageID.1154-55.)

### 5. Procedural History

Plaintiff sued Defendant and Defendant removed to this Court. (ECF No. 7.) Plaintiff sought discovery and the undersigned previously found, on the prior discovery motion, that discovery be "strictly circumscribed" according to the identified procedural challenge—what Plaintiff had identified as bias. (ECF No. 18.) The parties completed discovery, including depositions.

### C. Law and Analysis

### 1. Standard of Review

The parties in this case have stipulated and agreed that the arbitrary and capricious standard will apply to this Court's review of the Administrator's benefit determination in this action. (ECF No. 10.) *See Kemper v. Life Insurance Co. of North America*, No. 15-82, 2016 WL 4573911, at *3 (E.D. Ky Aug. 31, 2016); *see also Kennard v. Means Industries, Inc.*, No. 11-cv-15079, 2015 WL 4094611, at *5 (E.D. Mich. 2015).

"'The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action.'" *Kennard*, 2015 WL 4094611, at *5, quoting *Smith v. Continental Cas. Co.*, 459 F.3d 253, 259 (6th Cir. 2006). "The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions." *Kennard*, 2015 WL 4094611, at *5 (citing *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007)); *see also Muhammad v. Ford Motor Co.*, No. 11-12694, 2012 WL 95298, at *1-2 (E.D. Mich. Jan. 12, 2012); *Gravelle v. Bank One Corp.*, 333 F. App'x 955, 959 (6th Cir. 2009) (applying the arbitrary and capricious standard where a motion to affirm the administrative decision and a motion

for summary judgment were at issue.) "'But the arbitrary-and-capricious standard of review is not a rubber stamp [of] the administrator's decision.'" *Kennard*, 2015 WL 4094611, at *5 (quoting *Cooper*, 486 F.3d at 165).

### 2. Arguments and Analysis

#### a. Conflict of Interest

Plaintiff avers that "Defendant had a clear conflict of interest in this case, as it failed to conduct a fair and proper review of the administrative record when making its decision to deny benefits, and also has a serious lack of policies and procedures on how to handle claims such as this one." (ECF No. 32, PageID.1216.) Plaintiff argues that bias is present where, as here, Defendant had the sole authority to grant or deny the claims, had a financial incentive to deny the claims, and the only reasoned proffered for denial was a computer-programming mistake. (*See, e.g.*, ECF No. 32, PageID.1217.)

Under the arbitrary and capricious standard of review, the Sixth Circuit explained in *Leppert v. Liberty Life Assurance Co. of Boston*, 661 Fed. App'x 425, 431 (6th Cir. 2016):

> "[the arbitrary and capricious] standard is 'tempered' by any possible conflict of interest where the Plan Administrator both determines eligibility and funds the Plan." *Farhner v. United Transp. Discipline Income Protection Program*, 645 F.3d 338, 342 (6th Cir. 2011) (quoting *Univ. Hosp. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000)). "[S]uch a conflict is a red flag that may trigger a somewhat more searching review of a plan administrator's decision," although "the arbitrary and capricious standard remains in place." [*Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 311–12 (6th Cir. 2010)].
>
> A structural conflict of interest "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an

insurance company administrator has a history of biased claims administration." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). "It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking [sic] irrespective of whom the inaccuracy benefits." *Id*. "Mere allegations of the existence of a structural conflict of interest are not enough to show that the denial of a claim was arbitrary; there must be some evidence that the alleged conflict of interest affected the plan administrator's decision to deny benefits." *Jackson v. Metro. Life*, 24 F. App'x 290, 292 (6th Cir. 2001) (citing *Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998)); *Iley v. Metro. Life Ins. Co.*, 261 F. App'x 860, 864 (6th Cir. 2008) (same).

Plaintiff relies on *Sliwa v. Lincoln Nat'l Life Ins. Co.*, No. 13-01433, 2017 WL 536827 (D. Nev. Feb. 8, 2017).

First, in *Sliwa*, the plaintiff also argued that the defendant had a structural conflict of interest as the plan administrator and payor. *Sliwa*, 2017 WL 536827, at *2-3. But the Court there found that, under the Ninth Circuit standard, "[t]he evidence does not show [the defendant] has acted with malice, repeatedly interpreted plan terms incorrectly, or the like." *Sliwa*, 2017 WL 536827, at *2-3. The same is true here and this argument may be quickly addressed. As the Sixth Circuit has dictated in structural conflict of interest issues such as this, "'there must be some evidence that that the alleged conflict of interest affected the plan administrator's decision to deny benefits.'" *Leppert*, 661 Fed. App'x. at 431 (quoting *Jackson*, 24 Fed. App'x. at 292). Here, Plaintiff does not set forth any specific evidence or allegations of a conflict of interest other than to say Defendant had a financial interest in denying the claim. This does not pass muster under the standard for such a claim,

14

and I suggest any claims of conflict of interest should fail without further support or specificity.

### b. Principled, Deliberative Reasoning Process

Next, Plaintiff argues that "the administrative record offers no explanation as to why there are inconsistencies in Defendant's computer programming" other than internal emails among employees of Defendant expressing their confusion as to these erroneous identifications and letters. (*Id*. at PageID.1213.) Plaintiff argues that in denying her benefits, Defendant did not engage in a principled, deliberative, and reasoned process. (*Id*. at PageID.1217.) She argues there are clear irregularities in the handling of her claim. (*Id*.)

There seems to be two main points of contention between the parties: whether the sending of the initial lapse notice was sufficient to put Plaintiff on notice of the lapsed policy, even if she claims she did not receive it; and then, whether the second, mistaken letters carried any weight or authority, as the policy was already lapsed when they were mistakenly sent. But the standard that this Court must weigh these issues against is whether the Administrator's determination was "the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions." *Kennard*, 2015 WL 4094611, at *5

Returning to *Sliwa*, upon which Plaintiff relies, the Court there held that the defendant did not abuse its discretion in determining that the plaintiff received a copy of the policy; there, where the plaintiff claimed she did not receive the document in question but the defendant provided evidence that it was sent, the court held that "[the plaintiff's]

15

sworn statement that she did not receive any documentation and the lack of more precise records showing when and how the policy was delivered" was "self-serving and unverifiable, and therefore of limited evidentiary weight." *Sliwa*, 2017 WL 536827, at *4. This seems to bode in Defendant's favor, for the Administrative Record contains evidence of notices being sent to Plaintiff that her policy was lapsing. (METLIFE AR 000013, 000105, 000106, 000182, 000198, 000652; ECF No. 13, PageID.150, 242, 243, 319, 335, 789); (Exhibit 1, at METLIFE 9.22.2021 PRODUCTION 000001.)

And if this was the end of the confusion, it would be clear that Defendant acted reasonably—Defendant sent lapse notices to Plaintiff and Plaintiff did not act to keep the insurance active, thus, Plaintiff's claim for benefits was denied. However, the remaining factual issues in this case pose significantly more nuanced issues. The present case differs in at least one significant way from *Sliwa*: there, the issue was simply that the plaintiff could not confirm she did not receive the notices. But here, there is an added layer—the record confirms that in addition to the original letters notifying of a grace period, lapse date, and reinstatement option, Defendant did in fact send Plaintiff second, albeit mistaken, letters regarding her benefits, including seemingly offering her a second grace-period or extended date to act and keep the insurance active.

It is true that the Administrative Record here is not entirely clear. Even Defendant's employees appeared to be confused about what happened—their internal emails include

16

several question and comments suggesting that no one understood why or how the computer program designated Mr. Tuttle's account as one that should receive such letters.[1]

Confusion aside, the Administrative Record does reveal evidence, from Defendant's data records, of the relevant letters and notices being sent to Plaintiff: ECF No. 13. PageID.178, 242, 787, 179, 150, 243, 319, 335, 789. To this end, Defendant cites case law in support of its position, but it is not entirely persuasive. For instance, Defendant cites *Yessick v. Midland Life Ins. Co.*, 178 F. Supp. 2d 1301 (N.D. Ga. 2001) for the proposition that "proof of routine, customary computerized procedures is sufficient to show adherence to such procedures." However, here, there clearly was no routine and customary computerized procedures—it was precisely the mistaken and unknown computerized procedures that created this issue. Thus, *Yessick* lends itself more to the conclusion that there was not evidence of adherence to customary procedures here. Defendant also refers to *Foster v. Metro. Life Ins. Co.*, No. 03-02644, 2005 U.S. Dist. LEXIS 40507 (N.D. Cal. Dec. 7, 2005), arguing that there, the plaintiff denied receiving lapse notices, but MetLife "submitted a computer-generated log identifying all communications sent to [the plaintiff]," and the court determined "the conflict in the evidence does not raise a 'genuine' issue of material fact" and found that no jury could find in the plaintiff's favor. Again, this is not strong support for Defendant's position. Indeed, here, the computer-generated program includes a log, of some sort, of the communications sent to Plaintiff. But that log also includes several communications sent notifying Plaintiff that her grace period or

---

[1] I decline to include quotations from the record here regarding the internal emails as the document in which they are found has been sealed. (ECF No. 13.)

policy options were apparently extended. In contrast to *Foster*, here, it appears the computer-generated log does raise genuine issues of material fact from which a jury could, in fact, find in Plaintiff's favor.

Again, the standard for the Court's review of this issue is that "[t]he plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions." *Kennard*, 2015 WL 4094611, at *5. Because it does appear that Plaintiff's benefits ended on April 19, 2019, it seems that Defendant's determination to terminate benefits, and then to deny benefits, was rational considering the provisions of the Plan—but I cannot state as confidently whether it arose from a deliberate and principled reasoning process. The reasoning process by which the determination was made included a great deal of guesswork, confusion, unknowns, and technological issues on Defendant's part. For this reason, the undersigned suggests that this Court cannot grant summary judgment or make a judgement on the administrative record—I suggest it is unclear, even under the discretionary standard, whether the process by which Plaintiff's ultimate claim was denied, and her cashier's check returned, included a deliberate and principled reasoning. However, neither does this fall squarely in Plaintiff's favor, either. Because while it is unclear that Defendant acted with a deliberative and principled reasoning process, it is also unclear whether Plaintiff should be entitled to a reversal of benefits—indeed, the original policy had lapsed before Plaintiff acted and before she received the second set of letters. Therefore, the undersigned cannot grant Plaintiff's motion based on the present Administrative Record, either.

### D. Conclusion

For these reasons discussed above, I recommend **DENYING** Plaintiff's motion (ECF No. 31) and also **DENYING** Defendant's motion (ECF No.32).

### III. <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue

19

raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 22, 2022                    S/PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge